**WOOD-MOSAIC COMPANY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**WOOD-MOSAIC CORPORATION, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. Nos. 3287, 3288.**

United States District Court
W. D. Kentucky,
Louisville Division.

Feb. 20, 1958.

638

Charles F. Wood, Greenbaum, Barnett & Wood, Louisville, Ky., for plaintiff.

J. Leonard Walker, U. S. Atty., Louisville, Ky., for defendant.

SHELBOURNE, Chief Judge.

The two above styled and numbered actions were filed January 25, 1957, and, by an order dated July 17, 1957, they were consolidated and were tried together to the Court without a jury on September 11, 1957. They were submitted to the Court, following the filing of briefs, on January 2, 1958.

In action No. 3288, Wood-Mosaic Corpany (hereinafter referred to as "Company") seeks to recover corporation income and excess profits taxes paid for the fiscal years ended April 30, 1951, and April 30, 1952, in the aggregate sum of $152,926.43.

In action No. 3288, Wood-Mosiac Corporation (hereinafter referred to as "Corporation") seeks to recover corporation income taxes for the fiscal years ended April 30, 1952, and April 30, 1953, in the aggregate sum of $56,944.20. (Interest as provided by law is sought to be recovered by the plaintiff in each of the actions.)

By a written stipulation filed at the time of the trial, it appears that the Corporation was incorporated under the laws of the State of Kentucky in 1907, under the corporate name "Wood-Mosaic Company". November 28, 1947, the corporate name was changed to "Wood-Mosaic Corporation." The Corporation has engaged in substantially the same business activities in the United States and Canada continuously from 1907 to the present date. The Company was incorporated under the laws of the State of Kentucky on November 28, 1947. Thereafter, on December 1, 1947, the Corporation transferred its operating assets and manufacturing facilities located in the United States to the Company and, in consideration of the transfer, received 177,810 shares of the common capital stock of the Company, which represented all of the outstanding and issued capital stock of the Company.

Both the Company and the Corporation kept their books and operated on the accrual basis of accounting and upon the basis of a fiscal year ending April 30th of each year; this fiscal year was used as the basis of their tax returns. The Corporation filed its corporation income and excess profits tax returns for each of the fiscal years ended April 30, 1951, and April 30, 1952, and paid the taxes disclosed to be due in each return. The Corporation likewise filed timely corporation income and excess profits tax returns for each of the fiscal years ended April 30, 1952, and April 30, 1953, and paid taxes disclosed to be due in each return.

March 29, 1956, the Commissioner of Internal Revenue notified the Company that a determination had been made of deficiencies in income and excess profits taxes for the fiscal year ended April 30, 1951, in the sum of $118,613.09, and for the fiscal year ended April 30, 1952, in the sum of $34,861.44.

March 29, 1956, the Commissioner of Internal Revenue notified the Corporation by letter that deficiencies had been determined in its income and excess profits taxes for the fiscal year ended April 30, 1952, in the sum of $20,640.15, and for the fiscal year ended April 30, 1953, in the sum of $27,066.53.

The deficiencies and the interest thereon were paid by the Company and the Corporation to the District Director of Internal Revenue for the District of Kentucky. It is stipulated that both the Company and the Corporation timely filed their respective claims for a refund of the deficiencies in income and excess profits taxes and that, upon the claims for refund being officially disallowed and the separate claims for refund of interest

having been ignored for more than six months by the Commissioner, these actions were timely filed.

The nine questions involved, as stated by counsel in their briefs, are substantially as follows:

1. Whether the Commissioner erred in disallowing a deduction of a loss in the sum of $3,366.29, claimed by Wood-Mosaic Company for the fiscal year 1951, under the provisions of Section 23(f) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 23(f), on account of the alleged abandonment of machinery and equipment in that year. (Taxpayer was allowed to amortize or depreciate the amount disallowed over the next succeeding five years.)

2. Whether the Commissioner erred in disallowing a deduction in the sum of $40,000 claimed by Wood-Mosaic Company for the fiscal year 1951, under the provisions of Section 23(q) of the Internal Revenue Code of 1939, as a charitable contribution to MacLean Foundation.

3. Whether the Commissioner erred in disallowing a deduction of a loss or a reduction in the value of its inventory in the sum of $12,112.84, claimed by Wood-Mosaic Company for the fiscal year 1952, on account of the alleged damage to a supply of Philippine logs purchased and loaded on board ship prior to the close of its fiscal year 1952, but not received in the damaged condition until the following fiscal year.

4. Whether the Commissioner erred in refusing to allow Wood-Mosaic Company a loss claimed on account of the reduction in the value of its inventory of Philippine mahogany lumber at the close of its fiscal year 1952, in the sum of $15,264.50.

5. Whether the Commissioner erred in disallowing deductions claimed by Wood-Mosaic Company of its inventory of supplies on hand at the close of the fiscal years 1951 and 1952, in the sum of $6,439.61 and $2,098.40, respectively, as a result of its change in the method of accounting for such supplies from an inventory method to the method of expensing them as purchases were made.

6. Whether the Commissioner erred in disallowing a loss claimed by Wood-Mosaic Company for each of the fiscal years 1951 and 1952 in the sum of $5,000, respectively, of the amounts by which the value of its inventory of walnut veneers was written down during each of these years.

7. Whether the Commissioner erred in disallowing a write-down by the Wood-Mosaic Corporation in the value of its inventory of forearm gunstocks as at the end of the fiscal year 1952 to the extent of $5,782.35.

8. Whether Wood-Mosaic Company, as an "acquiring corporation" within the meaning of Section 462(a) of the Internal Revenue Code of 1939, as amended by the Excess Profits Tax Act of 1950, 26 U.S.C.A. Excess Profits Taxes, § 462 (a), may elect to compute its excess profits tax credits under Part I, Subchapter D of Chapter 1, 1939 Code, 26 U.S.C.A. Excess Profits Taxes, § 430 et seq., or whether it was required to compute its excess profits tax credits under Part II of that subchapter for the purpose of determining its excess profits tax for the taxable year 1951.

9. Whether Wood-Mosaic Corporation, as a "component corporation" within the meaning of Section 461(b) of the Internal Revenue Code of 1939, as amended, is entitled to or may elect to use its own base period experience prior to the date of transfer of its assets to Wood-Mosaic Company on November 28, 1947, in computing its excess profits credits for the purpose of determining its excess profits tax for the taxable years involved.

The facts relating to Question No. 1 above are that, in the taxable year of 1951, the Company had made at its plant in Huntington, West Virginia, a comprehensive inventory of machinery and equipment, by which it was ascertained that machinery and equipment carried in previous inventories at $3,366.29 was not on hand April 30, 1951. The Com-

pany claimed a loss on the grounds that the equipment had been abandoned due to theft or otherwise.

The examining revenue agent recognized that the machinery was not on hand April 30, 1951, and that the loss, if any, was not compensated for by insurance or otherwise; but, in an effort to reach a compromise agreement on the matters in dispute in this action, agreed to permit the taxpayer to charge off this loss by amortizing the amount of the loss over the next succeeding five years, beginning May 1, 1952. The parties have agreed that an allowance of the loss as a deduction for the fiscal year ended April 30, 1951, will require a readjustment of the tax properly due for the five-year period.

■■ There is no evidence that the loss did not occur in the fiscal year ended April 30, 1951; the testimony of the taxpayer lends to the conclusion that the equipment was lost during that taxable year. The determination of the year of loss is a practical and not a legal question. Lucas v. American Code Co., 280 U.S. 445, 50 S.Ct. 202, 74 L.Ed. 538; Mine Hill & Schuylkill Haven R. Co. v. Smith, 3 Cir., 184 F.2d 422. There is no evidence that the taxpayer could realize any salvage; this would particularly be true if the loss resulted from theft. This Court concludes that the loss was sufficiently shown to have been sustained, and that the loss constituted a proper deduction for the fiscal year ended April 30, 1951.

■ There likewise is little dispute in the evidence as to the facts in Question No. 2. For the fiscal year ended April 30, 1951, the Company claimed a deduction in the sum of $40,000, the amount paid on July 9, 1951, to Messrs. Paul MacLean, Angus MacLean, and William Franket, trustees for the MacLean Foundation, Inc. The Foundation was created on June 21, 1951; on July 30, 1952, it filed an application for exemption from federal income tax under Section 101(6) of the Internal Revenue Code, 26 U.S. C.A. § 101(6); the application for exemption was granted August 8, 1952, and the corporate Foundation received and administered the $40,000 for charitable, education and religious purposes.

No minute or record of any kind appears in the minutes of the Company, concerning the appointment of the two MacLeans and Franket as trustees, until after the revenue agent had completed his examination; the minutes of the April 16, 1951 meeting were then attempted to be amended so as to show the authorization for the contribution.

There was not attached to the Company's 1951 income tax return a written declaration that the resolution authorizing the contribution had been adopted by its board of directors, and, in making its written application for exemption as a charitable organization, the corporate Foundation stated that it was not an outgrowth or continuation of any form of predecessor.

The Company now contends that it is entitled to the deduction during the fiscal year ended April 30, 1951, because it accrued on its books, as of the end of the fiscal year 1951, the $40,000 contribution, which was paid within two and one-half months after the close of that fiscal year.

The Commissioner disallowed the contribution as a deduction in the fiscal year ended April 30, 1951, on the grounds that (1) the corporate Foundation was not in existence at the end of the fiscal year 1951; (2) Treasury Regulation 29.23 (q)-1 requires that (a) a deduction for such contribution must be reported on the tax return, and (b) there must be attached to the return a written declaration that the resolution authorizing the contribution or gift was adopted by the board of directors during the taxable year, which declaration must be verified by the president or principal officer of the corporation, and (3) no resolution was actually adopted by the board of directors prior to the close of the fiscal year 1951; no written declaration was attached to the tax return for the fiscal year 1951, showing that the board of directors had authorized or considered the contribution. The Commissioner has allowed this deduction for the fiscal year 1952.

The taxpayer relies upon Alabama Pipe Company v. Commissioner, 23 T.C. 95; Pierce Estates, Inc., v. Commissioner, 3 T.C. 875; Arthur Jordan Foundation v. Commissioner, 7 Cir., 210 F.2d 885; Bok v. McCaughn, 3 Cir., 42 F.2d 616; Dejay Stores v. Ryan, 2 Cir., 229 F.2d 867. All of these cases are distinguishable from the case at bar in that the contribution was made to named trustees or to existing charitable organizations then in operation, as in the Alabama Pipe Company case. In the case at bar, the corporation to which the contribution was actually made was not in existence during the fiscal year 1951, and there was no tangible evidence of any corporate action on the part of the directors of the Company evidencing a fixed intention to make that contribution until 1954.

This Court concludes that the deduction should be allowed for 1952, subject to the limitation provided for in Section 23(q) of the Internal Revenue Code, but it is not a properly allowable deduction for the fiscal year ended April 30, 1951.

■ Question No. 3 pertains to the Company's claimed loss in the sum of $12,112.84, resulting from damage to Philippine logs. The facts are not in dispute: the Company purchased the logs prior to April 30, 1952, when they were loaded on board ship in the Philippines; the logs did not arrive at the Company's plant in Louisville until June, 1952, at which time they were found to be defective. The evidence in the case is that the defects were such that they of necessity existed at the time the logs were loaded on board ship prior to April 30, 1952.

The Commissioner produced no evidence that the logs were not damaged when purchased by the Company in the fiscal year 1952, and no evidence that the Company could have or did discover the loss until the logs arrived at the Company's plant in Louisville in June, 1952.

The Court concludes that this loss was properly claimed and should be allowed for the fiscal year 1952.

■ Question No. 4 concerns the Company's claimed loss in the amount of $15,-264.50, resulting from a reduction in the value of its inventory of Philippine mahogany lumber at the close of the fiscal year 1952. The Company claimed this loss on account of the decrease in the market value of Philippine mahogany lumber on hand at the close of the fiscal year 1952, which decrease in market value was claimed to be due to sap rot, hook marks, cracks and splits, and the lumber was received in such sizes as to prevent its being sawed so as to be salable in the local market.

The claim is thoroughly accounted for in the undisputed testimony of Mr. Joseph Detrick. He testified that the invoices, showing the sales of lumber in the fiscal year 1952, were exhibited to and examined by the revenue agent, and a detailed explanation was made as to the damaged condition of the lumber. The revenue agent allowed the deduction for the fiscal year 1953, but the damage to the lumber is conclusively shown to have been existent at the close of the fiscal year 1952. Therefore, the loss should have been allowed for 1952 rather than 1953.

Question No. 5 relates to claimed deductions disallowed by the Commissioner in the sum of $6,439.61 for the fiscal year 1951, and in the sum of $2,098.40 for the fiscal year 1952.

The facts are that, prior to the fiscal years 1951 and 1952, the Company had expensed its supplies and small tools on hand at the end of the fiscal year. As the result of an audit, it was discovered by the Company that a small percentage of supplies and small tools erroneously had been placed on inventory rather than expensed at the end of each of the fiscal years 1951 and 1952.

The revenue agent was under the belief that supplies and small tools had been carried in inventory in other plants. Mr. Layton, the Company comptroller, testified that supplies and small tools had always been expensed, and that the claimed deductions amounted to correc-

tions made to conform with the Company's system of accounting.

The Court is of opinion that the Company merely corrected an error in its records in order that all supplies and small tools would receive the same treatment, and that the Commissioner was in error in disallowing the claimed deductions.

Question No. 6 involves a write-down, during the years 1951 and 1952, in the inventory value of veneers which had been on hand prior to World War II. The Company's representative, Mr. Bayens, testified that these veneers were popular before World War II, but after the War there was no market in foreign countries due to some extent to a change in style and to the loss of market or demand in South American countries.

The examining revenue agent allowed the total deduction for 1950, as a loss due to obsolescence.

The Court is of opinion that the Company was entitled to the claimed deductions of $5,000 in each of the fiscal years 1951 and 1952.

Question No. 7 involves a reduction in the value of the Corporation's gunstock inventory during the fiscal year 1952. During that year, the Corporation had a contract with the Pakistan government for the manufacture of firearms and other wooden gun assembly pieces. The forearm part of the gun assembly was required to be manufactured of first quality wood and within small tolerances; this resulted in a high percentage of rejections of the forearm pieces upon inspection. In 1952, the gunstock inventory was valued at $10,129.08. After the Pakistan government rejected many of the forearm pieces manufactured under contract for it, the value of the gunstock inventory was reduced to $727.35, as of April 30, 1952. Mr. Detrick testified that this latter amount fairly represented the lumber value of the gunstocks.

The examining revenue agent determined that the write-down in value was excessive to the extent of $5,782.35, and to that extent disallowed the deduction claimed by the taxpayer; but did allow the claimed deduction of $5,782.35 as a deduction for the fiscal year 1953. This apparently was a part of the effort to compromise the matters in dispute.

There is no evidence in the record indicating that the claimed loss on account of the reduction in value of the gunstock material was not apparent and properly allowable in the fiscal year 1952. It is, therefore, concluded by the Court that the rejection of the claimed deduction to the extent of $5,782.35 for the fiscal year 1952 was unwarranted.

Questions No. 8 and No. 9, which pertain to the excess profits tax claims of the Company and the Corporation, respectively, present a difficult problem. As stated by counsel for the Company and the Corporation, it is their contention that the Corporation was entitled to compute its excess profits tax credits by using its own base period experience under Section 435(d) of the Internal Revenue Code of 1939 and that, since the Company did not elect to combine its base period experience with that of the Corporation under Part II of the Excess Profits Tax Act of 1950, 26 U.S.C.A. Excess Profits Taxes, § 461 et seq., the Corporation was permitted to use its own base period experience for the general average of the base period years under Section 435(d). The contention is that, since the Company did not claim the right to use and did not use any of the base period experience of the Corporation, the Corporation could use its own base period experience prior to December 1, 1947, under Section 461 of the Internal Revenue Code of 1939, especially in view of the fact that the Company had not elected to use Part II in the computation of its own excess profits tax credit.

In Section 42.151, Volume 7A, Merten's Law of Federal Income Taxation, it is stated, "(T)ransfer of all or a part of the base period experience of a component corporation (Wood-Mosaic Corporation) to an acquiring corporation (Wood-Mosaic Company) as a result of a Part II transaction is accompanied by a reduction to that extent in the base pe-

riod experience which remains available for use in respect to the component corporation." In a note to this portion of the section, the author states, "The component loses the right to use the part of its base period experience made available to the acquiring corporation even though in fact the latter, where it has an option, may not choose to use it."

In computing its excess profits tax credits to determine its excess profits tax liability for the fiscal year 1951, the Company considered itself a "new corporation", under the provisions of Section 445, Part I, Subchapter D, Chapter 1, Internal Revenue Code of 1939. This produced a lesser amount of excess profits tax than would have been calculated under the provisions of Sections 435 and 436 of that subchapter.

The Commissioner determined that the Company was an acquiring corporation within the meaning of Section 461(a) (1) (A), Part II, Subchapter D, and did not qualify as a new corporation within the meaning of Section 461(d). The Commissioner concluded that the Company was not entitled to compute its average base period income under the provisions of Section 435, Part I, because of the provision of Section 462(g) (3), "in the case of a transaction described in section 461(a) where the acquiring corporation had commenced business, within the meaning of section 461(d), prior to the beginning of its base period, the acquiring corporation shall not be entitled to compute its average base net income under section 445 in the manner provided therein or as provided in this section." Therefore, the Commissioner recomputed the excess profits tax credit of the Company for the taxable year 1951 and the unused excess profits tax credit carry-back from the year 1952 to the year 1951, which materially reduced the amounts claimed by the Company in its returns for 1951 and 1952.

In computing its excess profits tax credit to determine its excess profits tax liability for the fiscal years 1952 and 1953, the Corporation used its own base period earning experience and applied the provisions of Section 435, Part I, Subchapter D. It thereby determined that no excess profits tax was due by it.

The Commissioner properly determined that the Corporation was a component corporation within the meaning of Section 461(b), Part II, Subchapter D, and could not compute its excess profits tax credits under Section 435, but that same were required to be computed under Part II.

There is no question but that the Corporation is a component corporation and the Company is an acquiring corporation, since the Corporation, on December 1, 1947, transferred to the Company all of its operating assets and manufacturing facilities in exchange for all of the outstanding capital stock of the Company. In this situation, Section 461(b), Part II, Subchapter D, makes the Corporation a component corporation, and Section 461(a), Part II, classifies the Company as an acquiring corporation. Since the Company was an acquiring corporation within the meaning of Section 461(a), it is considered, under Section 461(d), to have been in existence and to have had taxable years for all years during which the Corporation was in existence and is considered to have commenced business when the Corporation commenced business.

We conclude that the Company erroneously classified itself as a "new corporation" under Section 445. The Company computed its excess profits tax credits under the provisions of Section 445, Part I; but, as above stated, as an acquiring corporation under Section 461(a), Part II, Subchapter D, it was ineligible as a new corporation under Section 445. Therefore, the Commissioners determination that the Company was required to determine its average base period net income under Part II of the Excess Profits Tax Act was correct, and the Company could not elect to compute its excess profits tax credits other than under Part II of Subchapter D.

The Corporation, in its excess profits tax returns for the fiscal years ended

April 30, 1952, and April 30, 1953, computed its excess profits tax credits under the provisions of Section 435(d), Part I, on the basis of its own average base period net income. On its return for the fiscal year 1952, it claimed an unused excess profits tax credit carry-over from the fiscal year 1951 in a substantial amount and, on the return for the fiscal year 1953, it claimed unused excess profits tax credit carry-overs from the fiscal years 1951 and 1952 in an aggregate amount of $478,722.21.

The Commissioner determined that the Corporation was required to compute its excess profits credits as a component corporation under Section 461(b), Part II; that it was not entitled to use its own base period experience prior to the day after the date of the Part II transaction (December 1, 1947) in the computation of its excess profits credits, and that under no provision of the Excess Profits Tax Act of 1950 could the excess profits credits be computed to be in excess of the minimum annual amount of $25,-000 prescribed in Section 431, Part I. This resulted in the excess profits credit for each of the fiscal years 1952 and 1953 being reduced to $25,000, and thereby eliminated any unused excess profits credit carry-overs from the fiscal years 1951 and 1952 to the fiscal year 1953, since the excess profits net income for the fiscal year 1951 was only $178.46 less than the minimum credit and exceeded the minimum credit for the fiscal years 1952 and 1953.

█ The issue raised as to the Corporation is whether it is mandatorily required to have its excess profits credit determined under Part II, or whether it may elect to have it determined under Part II or under the provisions of Section 435(d), Part I. It is our view that it was contemplated by Congress that, and Part II so provides, ownership of the property which gave rise to earning in the base period years must determine the entity which has the right to this experience in the excess profits tax years; therefore, an acquiring corporation may use the base period earning experience of the component corporation prior to the Part II transaction, but the component corporation is prohibited from so doing. If the component corporation remains in existence, it loses any benefit it might otherwise have from its experience prior to the Part II transaction (December 1, 1947). We think the Commissioner was correct in his determination of the Corporation's method by which its excess profits tax must be determined.

The conclusion reached by the Court will be the basis of the judgment to be submitted by counsel for the United States, upon proper notice to counsel for plaintiff.