KIMBLE GLASS COMPANY AND OWENS-ILLINOIS GLASS COMPANY, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 59484, 64203. Filed March 31, 1961.

*Roswell Magill, Esq., Henry de Kosmian, Esq.,* and *Donald M. Hawkins, Esq.,* for the petitioners.

*Frank W. Hardy, Esq.,* for the respondent.

OPINION.

HARRON, *Judge:* In the case of Kimble Glass, the basic issue relates to the determination of the amount of its excess profits credit for the

years 1950 and 1951. In the case of Owens-Illinois, there are two primary issues, (1) the amount of its excess profits credit for the year 1951, and (2) the amount of the percentage depletion allowance for the mining of feldspar, under sections 23(m) and 114(b)(4), for which deduction is allowable. Consideration is given first to the excess profits credits issues.

The contentions of the petitioners are as follows: Kimble Glass claims that it satisfies the requirements of section 435(e)(1)(B) of the 1939 Code (the television growth formula) and is entitled to compute its average base period net income under section 435(e)(2) in determining its excess profits credit. Kimble Glass claims in addition that it is entitled to exclude losses sustained in 1948 and 1949 from its Kaylo business, under section 433(b)(18), in determining its excess profits net income for 1948 and 1949 for the purpose of determining its average base period net income.

Owens-Illinois contends that in determining its average base period net income there should be included in its average base period net income the profits which it realized from its television bulb business, and there should be excluded the losses of the Kaylo business which were realized by Kimble Glass, or which are allocated to Kimble Glass under section 462(e)(6).

The petitioners contend further that the amounts of the excess profits tax for 1950 of Kimble Glass and Owens-Illinois, imposed retroactively by the 1950 Excess Profits Tax Act, should be disregarded in determining under section 437(c) the equity capital of each petitioner, respectively.

In its 1951 income tax return, Kimble Glass reported income tax net income of $2,102,418.47, and excess profits net income of $2,099,354.04, and tax in the amount of $1,060,703.74, which it paid. Kimble Glass claimed an excess profits credit for 1951 in the amount of $6,608,022.29, which amount exceeded its excess profits net income for 1951 by $4,508,668.25. Kimble Glass claimed the foregoing amount as an excess profits credit carryback to 1950 and received a refund of $210,845.11 for 1950. For 1950, Kimble Glass reported income tax net income in the amount of $13,149,220.78, excess profits net income of $13,146,608.90, and a tax of $6,845,373.53, which was paid. The above refund of $210,845.11 resulted from the carryback from 1951.

In the notice of deficiency the respondent, making two minor adjustments, determined that for 1951 Kimble Glass' income tax net income was $2,098,624.27, that its excess profits net income was $2,095,559.84, and that the excess profits credit was $1,609,527.92. This resulted in a deficiency of $143,884.02 for 1951 and the disallowance of the tentative refund of $210,845.11 made to Kimble Glass for 1950. For the year 1950 respondent made two small adjustments, resulting in a

reduction of total income tax liability as assessed by petitioner on its original return of $1,850.90, which, when combined with the disallowance of the $210,845.11 tentative refund for 1950, resulted in a deficiency of $209,024.25.

Kimble Glass in its petition asserts that it is entitled to compute its average base period net income, for purposes of the excess profits credit, under section 435 (e) (2), and further, that in arriving at such base period net income it may exclude certain losses during 1948 and 1949 from its Kaylo business within the provisions of section 433 (b) (18). Under this theory Kimble Glass claims a refund, based on a claimed excess profits credit of $6,287,016.68, of $837,634.01 for 1950, in addition to the $210,847.11 tentative refund previously received. For 1951, Kimble Glass claims a refund of $1,925.56 which results from the downward adjustment in its income tax net income made by respondent coupled with its prior and present assertion that its excess profits credit exceeds its excess profits net income.

In computing its excess profits credit for the year 1951, Owens-Illinois eliminated from its base period losses sustained in the operation of the Kaylo business under the provisions of part II of the Excess Profits Act of 1950, and included in its base period the profits realized from its television bulb operations.

The respondent, in his notice of deficiency, determined that the provisions of part II are not applicable to the losses arising from the operation of the Kaylo business, and that such losses must be restored to the base period income of Owens-Illinois. Furthermore, the respondent determined that the provisions of part II are applicable to the television bulb operations and, therefore, the base period profits of the television bulb business are to be eliminated from Owens-Illinois' base period net income.

These two changes in the computation of Owens-Illinois' excess profits credit, along with several minor adjustments, including the allowance of an increased depletion deduction of $38,591.64, resulted in the determination of a deficiency of $330,462.50 for 1951.

In its petition, Owens-Illinois maintained its position as to the proper computation in determining its excess profits credit. Furthermore, it claimed an additional depletion deduction of $160,275.10 over the amount claimed on its original return. The claim for an additional depletion deduction resulted in a claim for an overpayment of tax of $179,417.51.

Both petitioners for the year 1951, in computing their net capital additions, one of the elements affecting their excess profits credit, failed to reduce their equity capital for January 1, 1951, by the amount of excess profits taxes for the year 1950, which taxes were imposed retroactively by the Excess Profits Tax Act of 1950, which became effective on January 3, 1951.

Owens-Illinois has been, and is, a leading manufacturer of glass bottles and other glass containers. However, with the increased competition in the container business Owens-Illinois began, as long ago as the 1930's, to broaden its line of manufacture into other types of glass products. In 1940 Owens-Illinois began developing a structural product known as Kaylo Roof Tile, composed of lime, silica sand, and asbestos. Subsequent to this Owens-Illinois acquired plants at Berlin and Sayreville, New Jersey, where the manufacture of this Kaylo product was started.

During the 1940's Owens-Illinois was also engaged in the production of glass blocks and, to a minor extent, glass insulators at plants in Muncie, Indiana, and Columbus, Ohio.

Because these three products, Kaylo, glass blocks, and glass insulators, were or were expected to be marketed in the construction and building business and also because the manufacture and marketing of these products differed substantially from its glass container operations, Owens-Illinois decided to set up a subsidiary corporation and transfer to it the assets necessary to manufacture these three products.

This transaction was carried out in late December 1947, by the creation of Kimble Glass and the transfer to it of the plants located at Columbus, Ohio, Sayreville and Berlin, New Jersey, and Muncie, Indiana, including machinery, equipment, furniture and fixtures, inventories, and other assets relating to the properties above described. In return Owens-Illinois acquired 10,000 common shares of Kimble Glass, its entire authorized capital stock, and Kimble Glass became a subsidiary.

Following the transfer of the Kaylo and the glass block and insulator businesses to Kimble Glass, it engaged in (1) the production of Kaylo at the Sayreville and Berlin, New Jersey, plants and (2) the production of glass blocks and insulators at the Muncie, Indiana, and Columbus, Ohio, plants. Shortly thereafter, the relatively small production of glass blocks and insulators at the Ohio plant was discontinued. On June 15, 1948, Kimble Glass sold the Columbus, Ohio, plant to Owens-Illinois for $1,736,458.19, paid in cash. The production of glass blocks and insulators at the Muncie, Indiana, plant continued and Kimble Glass is still engaged in that activity.

Kimble Glass was unable to manufacture Kaylo at a cost which would enable it to be sold profitably. More efficient manufacturing processes were essential. Moreover, contrary to the original expectation, it was not possible to market Kaylo through existing glass block distribution channels. The management concluded that the problem of producing Kaylo profitably could best be solved by teaming the more experienced research personnel of Owens-Illinois, who had participated in the initial development of Kaylo, with production personnel who could devote undivided attention to the problems involved,

and that in the meantime there should be curtailment of efforts to market Kaylo products. It was decided that the Kaylo business should be transferred from Kimble Glass to Owens-Illinois.

On July 1, 1949, Kimble Glass sold to Owens-Illinois the assets used in the Kaylo business, including the Sayreville and Berlin, New Jersey, plants for $11,631,741.46, paid partly in cash and partly by cancellation of amounts owed by Kimble Glass to Owens-Illinois. The sale of these assets was at their book value. No gain or loss was recognized by either party.

Following the above sale, Owens-Illinois conducted the Kaylo business and was still doing so at the time of the trial.

On the same day, July 1, 1949, that Kimble Glass sold the Kaylo assets to Owens-Illinois, Owens-Illinois sold to Kimble Glass its assets used in the production of television bulbs, including the plant at Columbus, Ohio, which had been converted to the production of television bulbs in 1948. Such assets were sold at their book value for cash in the amount of $2,288,043.22. No recognized gain or loss to either party resulted from this sale.

Before 1949, Owens-Illinois had been developing and improving the television bulbs which it manufactured. The earlier television bulbs manufactured were of small dimensions and could be made by the glassblowing process. However, as the size of the bulbs increased, Owens-Illinois was forced to abandon the glassblowing process and produce the three components of the television bulb, i.e., faceplate, funnel, and neck, separately. The faceplate and funnel were produced by a glasspressing process and then all three components were sealed together to make the finished television bulb. These glass pressing and sealing operations were similar to the pressing and sealing operations performed by Kimble Glass in its manufacture of glass blocks. Because of Kimble Glass' experience with these two operations, it was deemed advisable by Owens-Illinois to transfer the television bulb business to Kimble Glass.

From the date of the sale, July 1, 1949, on to the time of the trial Kimble Glass has operated the television bulb business.

The Excess Profits Tax Act of 1950 (secs. 430–474), as amended, set up two general standards for determining the excess profits credit which is deducted from net income to determine the portion thereof subject to excess profits tax, namely, (1) the taxpayer's earnings experience during a base period of 4 years, 1946 to 1949, inclusive, or (2) the taxpayer's invested capital.

Congress recognized that both standards required material exceptions and qualifications in order to avoid gross inequities and to limit the tax, as far as possible, to truly excessive income brought about by war conditions. One of such qualifications was the so-called television

growth formula set forth in section 435(e)(1)(B).[1] Congress was informed that the television industry had started during the base period, but its enormous growth had occurred toward the end of that period and thereafter. Television was a new method of bringing entertainment into the home which had grown phenomenally due to its great inherent interest and convenience. If the general standards for determining the excess profits credit were applied to earnings attributable to the production and sale of components of television sets during excess profits tax years, a great part of such earnings would be subject to a heavy tax although they were not war earnings. Consequently, Congress adopted a special growth formula in section 435(e)(1)(B) applicable only to taxpayers selling a product not generally available to the public prior to 1946, whose 1949 sales of such product were at least 20 times its 1946 sales of the same product, whose 1950 sales of the product were 40 percent of its total net sales, and whose sales for the first 6 months of 1950, multiplied by 2, equaled or exceeded 150 percent of its average net sales for 1946–1947. It is clear that, first, the application of the television growth formula is narrowly limited, and, second, that the Congress made a special effort to insure fair treatment for the particular taxpayer falling within the scope of the provision.

Kimble Glass contends that it meets the requirements of clauses (i) and (ii) of section 435(e)(1)(B). With respect to those clauses, respondent, on brief, does not make any argument or contention. Rather, he makes the limited contention that Kimble Glass has failed to show that it satisfied the requirement of clause (iii) of section 435(e)(1)(B). In this situation, we deem it unnecessary to discuss the argument of Kimble Glass dealing with the application of clauses (i) and (ii) and conclude that Kimble Glass has shown that it complied with the provisions of clauses (i) and (ii). We turn, therefore, to consideration of the provisions of clause (iii).

Subdivision (iii) requires that the amount of the taxpayer's net sales which is attributable to such product or class of similar products (referring to the manufacture of television bulbs) for the calendar year 1946 is 5 percent, or less, of the amount of its net sales attributable to such products for the calendar year 1949. The net sales of television bulbs by Owens-Illinois during 1946 was $354,430.89, and for purposes of determining petitioner's qualification under this subdivision, these sales may be attributed to Kimble Glass. Such amount is less than 5 percent of petitioner's actual sales of television bulbs for 1949 of $8,174,895.13. Therefore, it is the contention of Kimble Glass that it satisfies the test set forth in clause (iii) of section 435(e)(1)(B).

---

[1] The legislative history of section 435(e).(1)(B), which was introduced as a floor amendment in the Senate, shows that Congress was primarily concerned with the television manufacturing industry. See 96 Cong. Rec. 16803.

Respondent argues that at the time of the sale of the television bulb assets by Owens-Illinois to Kimble Glass on July 1, 1949, there was an inventory of finished goods and work in process, and that for the purpose of determining the amount of the sales of television bulbs by Kimble Glass in 1949, there must be allocated to Owens-Illinois those sales made by Kimble Glass of the finished or partly finished inventory items, i.e., television bulbs. Respondent argues that Kimble Glass never made the necessary allocation and, therefore, has failed to prove that it complied with section 435(e)(1)(B)(iii).

Respondent's point is not well taken. There is no requirement in section 435(e)(1)(B)(iii) that any such allocation must be made. This clause is phrased in terms of a test of sales by the taxpayer, not profits. There is no requirement that the sales to be used in determining the qualification by the taxpayer shall be restricted to sales of products manufactured by the seller. Sales by Kimble Glass of television bulbs which it purchased from Owens-Illinois were indisputably sales of television bulbs by Kimble Glass, the taxpayer. Therefore, we hold that Kimble Glass meets the literal requirements of section 435(e)(1)(B)(iii).

Respondent further argues that the business of Kimble Glass was not a growing business as envisioned by the statute. But he does not cite any authority for this theory. Respondent argues, citing *Lucky Lager Brewing Co.*, 26 T.C. 836, affd. 246 F. 2d 621, that Congress intended to measure increase in physical volume of production in section 435(e)(1), and that in the case of Kimble Glass, it has not been shown that it had such an increase; but, rather, that Kimble Glass merely substituted a profitable product, television bulb assets, for an unprofitable product, the Kaylo assets.

In the *Lucky Lager* case, we recognized that the general approach of section 435(e)(1)(A) was to measure increase in physical volume, and that one of the tests there used for this purpose was that gross receipts for the last half of the base period should be 150 percent or more of gross receipts for the first half of the base period. However, we observed that the gross receipts test is not a direct measure of physical volume of production because an increase in gross receipts could result solely from an increase in the price of the commodity sold without any attendent increase in the physical volume of production. We stated that this possibility was in the legislative mind, but that the percentage used in the gross receipts test was deemed by Congress to be sufficiently large so that only those taxpayers will be able to qualify whose business has grown substantially more rapidly than the average.

Section 435(e)(1)(B) was introduced as a floor amendement in the Senate (96 Cong. Rec. 16803) and, therefore, the House and Senate committee reports do not discuss this subsection. It may be presumed,

however, that subsection (B) also attempts to measure increase in physical volume of production, using sales as the yardstick. However, what we said about subsection (A) must also apply to subsection (B), namely, that Congress, though it may have intended to require an increase in physical volume of production, used net sales as the criterion to measure an increase in production, and that the required percentage increase in subsection (B) was set by Congress high enough so that a taxpayer would have to have an increase in production in order to meet the percentage requirement.

Kimble Glass has shown that it has complied with all the requirements of subsection (B). This is all that it had to do. Congress has assumed that anyone who has met the requirements of subsection (B) has had the requisite increase in production without measuring this increase in production directly. Futhermore, we can fairly conclude from the record that petitioners did have the requisite increase in volume of production. The total net sales of Kimble Glass for the first half of 1950 alone was $13,559,275.54. The net sales of television bulbs of Kimble Glass in 1950 amounted to $25,682,060.01, as compared to net sales for the last 6 months of 1949 of $8,174,895.13. We are convinced that an increase in such an amount cannot be explained solely by inflation or the like, but must be deemed to be due, in part at least, to an increase in the volume of production. The television bulb business was a growing business and exactly the type of business for whose benefit section 435 (e) (1) (B) was intended.

Respondent also argues that there was "unauthorized use" by Kimble Glass of 1946 and 1947 sales of Owens-Illinois and that this results in a duplication of earnings experience. He cites *Industrial Loan Society, Inc.*, 14 T.C. 487. There is no merit in this contention. The statute requires that part of the net sales in 1946–1947 by Owens-Illinois shall be allocated to Kimble Glass for the purpose of determining whether Kimble Glass is qualified under the television growth formula; i.e., whether Kimble Glass' own 1949 and 1950 sales *exceeded* the 1946 and 1947 sales allocated to it by the required percentages. In determining its own base period net income under section 435 (e) (2), Kimble Glass has to use only its own base period experience for 1949 and 1950. On the other hand in determining its average base period net income, Owens-Illinois has to use its own base period income reduced by the 1946–1947 excess profits net income allocated to Kimble Glass under section 462(i) (6), which Kimble Glass cannot use in computing its average base period net income under section 435 (e) (2). We agree with the petitioners that the respondent's concern about a duplication of earnings experience is unfounded because there is no duplication of earnings experience.

It is concluded that Kimble Glass has satisfied each of the requirements of section 435 (e) (1) (B) and, therefore, is entitled to the bene-

fits of its provisions, and may compute its average base period net income under section 435(e)(2).

The next question is whether in determining its excess profits net income for 1948 and 1949, Kimble Glass is entitled to exclude losses from its Kaylo products business.

In determining average base period net income, it is necessary first to determine the excess profits net income for each month in the base period. Such amount is, in general, one-twelfth of the excess profits net income for each taxable year in the base period. The definition of excess profits net income, insofar as it relates to the base period, is contained in section 433(b). It is there provided that, for purposes of computing the average base period net income, the excess profits net income for any taxable year shall be the normal-tax net income, as defined in section 13(a)(2) as in effect for such taxable year, increased or decreased by the adjustments enumerated in paragraphs (1) through (18).

For present purposes, we are concerned with the adjustment described in section 433(b)(18),[2] which reads as follows:

ADJUSTMENT FOR BASE PERIOD LOSSES FROM BRANCH OPERATIONS.—In the case of a taxpayer which during two or more such taxable years operated a branch at a loss, the excess profits net income for each such taxable year (determined without regard to this paragraph) shall be increased by the amount of the excess of such loss above the loss, if any, incurred by such branch during the taxable year for which the tax under this subchapter is being computed. As used in this paragraph, the term "branch" means a unit or subdivision of the taxpayer's business which was operated in a separate place from its other business and differed substantially from its other business with respect to character of products or services. A unit or subdivision of the taxpayer's business shall not be considered to differ substantially from the taxpayer's other business unless it is of a type classifiable by the Standard Industrial Classification Manual in a different major industry group or in a different subgroup of the taxpayer's major industry group than that in which its other business is so classifiable: *Provided, however,* That this paragraph shall not apply unless the sum of the net losses of such branch during the base period exceeded 15 per centum of the aggregate excess profits net income of the taxpayer during the base period. For the purposes of this paragraph, the aggregate excess profits net income of the taxpayer during the base period shall be the sum of its excess profits net income for all years in the base period, increased by the sum of the net losses of such branch during the base period.

Kimble Glass acquired the Kaylo and the glass block and insulator businesses from Owens-Illinois at the end of 1947. Kimble Glass produced and sold Kaylo in 1948 and 1949. It realized a loss from its Kaylo business for 1948 of $2,335,152.17. During 1949 it realized a further loss from that business of $1,161,859.66. The question is whether such Kaylo losses are excludible in computing Kimble Glass' excess profits net income for 1948 and 1949 under section 433(b)(18).

---

[2] Section 433(b)(18) was added in 1952 by section 4 of Public Law 594, effective for taxable years ending after June 30, 1950.

The first requirement under section 433(b)(18) is that the branch must have been operated at a loss during 2 or more taxable years in the base period. Kimble Glass operated the Kaylo business during the taxable years 1948 and 1949 and realized losses therefrom during each of such 2 years.

The second requirement is that the Kaylo business must have been a branch of Kimble Glass' business. That term is defined in section 433(b)(18) to mean a "unit or subdivision of the taxpayer's business which was operated in a separate place from its other business and differed substantially from its other business with respect to character of products or services." Kaylo was produced by Kimble Glass at separate plants at Sayreville and Berlin, New Jersey, and was marketed through a separate sales organization. During the same period, Kimble Glass was producing glass blocks and insulators at Muncie, Indiana, and at Columbus, Ohio. Kimble Glass has shown that Kaylo differed substantially from the other base period products of Kimble Glass which consisted of glass blocks and insulators and, after June 30, 1949, television bulbs. Glass blocks and insulators and television bulbs were all glass products. Kaylo was not a glass product. Kaylo was a chemical compound of lime, asbestos, and sand and was useful as an insulating material, as well as for roof deck slabs, wall panels, and fire doors. If Kaylo had not differed substantially from the other base period products, it would not have been possible for Kimble Glass to have sold the Kaylo business to Owens-Illinois on June 30, 1949, and to have retained the glass block and insulator business and acquired the television bulb business. Kaylo is still being produced by Owens-Illinois, and Kimble Glass is producing glass blocks, glass insulators, and television bulbs.

Respondent argues that Kaylo was similar to glass blocks and insulators because all were used in the building and construction industry, and, therefore, that the Kaylo business did not differ substantially from the glass block and insulator business. This contention is clearly without merit. For example: Many products other than glass are used in the building and construction industry, such as steel and wood. It cannot be said that the steel business and the lumber business do not differ substantially from the glass block business. As a matter of fact, the glass insulators produced by Kimble Glass were used primarily by the communication industry. Furthermore, Kaylo products were not restricted to the building and construction industry because Kaylo had important uses as an insulating product, and it was in the high-temperature insulation field that Kaylo ultimately was found to have its best application.

Another requirement of section 433(b)(18) is that the branch business must have been classified by the Standard Industrial Classifica-

tion Manual in a different major industry group or in a different subgroup of such major industry group than that in which the taxpayer's other businesses were classified. It has been stipulated that Kimble Glass satisfies this requirement; that is to say, that the production of Kaylo was classified in a different major industry subgroup than the production by Kimble Glass of its other base period products, consisting of glass blocks and insulators and television bulbs.

The final requirement is that the sum of the branch net losses during the base period must have exceeded 15 percent of the taxpayer's aggregate excess profits net income during the base period which, for this purpose, is increased by the sum of the net losses from the branch in question. Kimble Glass easily satisfies this requirement. Its excess profits net income during 1948 and 1949, when increased by the Kaylo losses, aggregated $4,506,065.73.

It is concluded that Kimble Glass is entitled to exclude its Kaylo losses for 1948 and 1949 in the computation of its average base period net income. Since Kimble Glass did not realize any Kaylo losses for the years 1950 and 1951 here involved, the adjustment under section 433(b)(18) is the full amount of its 1948 and 1949 net Kaylo losses.

Respondent argues that if Kimble Glass' contentions are sustained, the result will be that neither the average base period net income of Owens-Illinois nor of Kimble Glass will reflect the Kaylo losses of Kimble Glass. That is true, but we believe it is immaterial. As far as Owens-Illinois is concerned, the Kaylo losses of Kimble Glass were not realized by Owens-Illinois, and such losses should not be reflected in the average base period net income of Owens-Illinois. The inevitable effect of section 433(b)(18) in any case to which it is applicable is that the losses excluded thereunder are not reflected in the average base period net income of the taxpayer which realized them and are not reflected in the average base period net income of any other taxpayer. The respondent erred in failing to allow Kimble Glass the benefit of section 433(b)(18).

*Computation of Average Base Period Net Income of Owens-Illinois.*

This issue involves the determination of the average base period net income of Owens-Illinois, for the purpose of computing its excess profits credit, with respect to which the respondent has made adjustments for which, the petitioners contend, there is no supporting authority. The respondent made his determination under a view about certain transactions of Owens-Illinois and Kimble Glass, involving both Kaylo and television bulb products and assets, with which petitioners vigorously disagree. Furthermore, respondent's adjustments were made under a theory which the petitioners claim is without foundation.

The respondent excluded from the average base period net income of Owens-Illinois, the television bulb profits realized by it when Owens-Illinois operated the television bulb business during the period January 1, 1946, to June 30, 1949. That determination of the respondent was made in computing the excess profits credit of Owens-Illinois. Respondent made that determination upon his theory and conclusion that the television bulb business, in 1949, was transferred to Kimble Glass in a part II transaction (secs. 461-464, 1939 Code), which the petitioners deny. They say that there was a sale for cash.

The transfer of assets to Kimble Glass was made on July 1, 1949. Respondent refers to that transfer as Transaction 2 (under his theory), as distinguished from the transfer of the Kaylo, Insulux, and other assets by Owens-Illinois to Kimble Glass on January 2, 1948, which he refers to as Transaction 1 (under his theory). Reference is made hereinafter to these transactions. Petitioners object to respondent's premise that what respondent calls Transaction 2 was a "finalization" of Transaction 1.

Petitioners maintain that when the Kaylo assets were transferred to Kimble Glass (then A.S.P.) at the end of 1947, or the beginning of 1948, there was then no predetermined plan contemplating any subsequent transfers of properties such as were made on July 1, 1949.

Since the very statement of the problem involves referring to the operation of the Kaylo products business by one or the other of the petitioners, and, also, the operation of the television tube business by one or the other of the petitioners, it may be convenient, to say the least, to restate the background facts before turning to the questions to be decided.

Kimble Glass was incorporated on December 23, 1947, under the name of American Structural Products Company.

Owens-Illinois developed prior to 1947 a chemical-compound product made of lime, silica, asbestos, and sand to which it gave the trade name "Kaylo." Owens-Illinois operated the Kaylo business during 1946 and 1947, prior to transferring it to Kimble Glass. It began production of Kaylo in 1941.

As of January 2, 1948, or at the end of 1947, Owens-Illinois transferred several assets and production divisions, including the Insulux Division (which made glass blocks and insulators) and the Kaylo Division to Kimble Glass (A.S.P.) in return for all of its authorized capital stock, consisting of 10,000 shares of the common stock and it became a wholly owned subsidiary of Owens-Illinois.

The respondent points out that this transaction was a part II transaction of the type described in section 461(a)(1)(E), part II, subchapter D, and that Kimble Glass became an acquiring corporation, and Owens-Illinois became a component corporation within the def-

initions contained in section 461 (a) and (b). The petitioner does not deny this. Under respondent's theory, this is the start of the problem here.

Kimble Glass carried on the Kaylo production business from the beginning of 1948 until July 1, 1949. It sustained losses. They amounted to $2,335,152.17 in 1948, and $1,161,859.66 in the first 6 months of 1949.

On July 1, 1949, Kimble Glass sold the Kaylo business and assets, including two plants in New Jersey to Owens-Illinois for cash in the sum of $11,631,741.46. Thereafter, Kimble did not carry on any Kaylo business. The assets were sold at book value. Accordingly, Kimble carried on the Kaylo business only from January 1, 1948, through June 30, 1949.

After June 30, 1949, Owens carried on the Kaylo business from July 1, 1949, on, and it still operates that business. Owens sustained losses, as stated in the facts in each of the years 1949, 1950, and 1951. Subsequently that business showed a profit.

It is at this point that respondent's views under this issue turn to an allegation about what he regards as a tendency of Owens to transfer assets back and forth rather freely, for on July 1, 1949, Owens sold assets to Kimble, namely, its television bulb production assets, including a plant in Columbus, Ohio, where TV bulbs were made. Owens sold the assets for cash, at book value, for the sum of $2,288,-043.22, and no gain or loss was realized. Thereafter Kimble produced TV bulbs and still does so.

Owens owned and operated the TV bulb business from January 1, 1946, to June 30, 1949. From that business, Owens realized net profits as follows: $43,949.43 for 1946; $196,736.78 for 1947; $203,-312.74 for 1948; and $1,289,022.22 for 1949.

The respondent takes the following position: Transaction 1, at the end of 1947, the exchange of Kimble's stock for the Kaylo assets, was a part II transaction. Transaction 2, on July 1, 1949, involved two transactions, the sale of Kaylo assets by Kimble to Owens, and the sale of TV bulb assets by Owens to Kimble. The respondent argues that these two sales of assets were mere form, and that in substance there was only an exchange of assets by Owens and Kimble and a "finalization" of the 1947 transfer of the Kaylo business to Kimble, whereby those assets went back to Owens-Illinois. As such, respondent argues that Transaction 2 was a part II transaction, also, and that Kimble is still, in this transaction, the acquiring corporation, as described in section 461(a)(1)(E), and Owens is still its component.

It is the respondent's primary contention that the losses sustained from the carrying on of the Kaylo productions business must be included in Owens-Illinois' "base period experience in order that

its excess profits credit and excess profits net income be computed *on a consistent basis.*" He argues that since Owens operated the Kaylo business during the base period years of 1946 and 1947 and the last 6 months of 1949 and all of the excess profits tax years, it is only proper that all of the Kaylo losses incurred during the base period years should be included by Owens in the computation of its excess profits credit. He applies the same reasoning to the profits realized from the conduct of the TV bulb business, namely, that since Owens did not have the TV bulb business during its excess profits years, it would be improper to include the TV bulb profits in Owens' base period experience. Therefore, the respondent contends that he properly excluded the profits realized from the TV bulb business in computing Owens' excess profits credit. Cf. *Wood-Mosaic Company* v. *United States*, 160 F. Supp. 636, affd. 272 F. 2d 944, involving a part II transaction, which held that a component corporation is not entitled to use its pre-1947 base period earnings experience where it transferred assets to an acquiring corporation in 1947 in a transaction described in section 461.

The question is, therefore, whether the transactions on July 1, 1949, constituted a part II transaction, so that in computing the excess profits credit of Owens-Illinois, the losses sustained in the years 1946–1949, inclusive, from the operation of the *Kaylo* business must be *included* in the base period experience of Owens, and the profits earned during the years 1946 to 1949, inclusive, in operating the television bulb business must be *excluded* from the base period experience of Owens.

The position of Owens-Illinois is that there were bona fide, arm's-length sales of properties on July 1, 1949, and that the evidence does not provide any support for respondent's claim that the transfers of properties by Kimble Glass to itself, or the transfers by itself to Kimble constituted a part II transaction, in which Owens-Illinois was a component corporation.

The crux of the issue is whether the July 1, 1949, transaction was a part II transaction. The respondent argues for the application of the substance-over-form rule in these cases, and he urges the invocation of that rule here to avert distortion of the purpose of the statute. We are of the opinion, however, that the record does not support a finding that the transactions of both corporations with each other involved mere paper transfers of property between affiliated corporations. For example, on the record here, a holding that the 1949 transfers of properties were not sales for cash would be unwarranted. Nor are we able to conclude that Kimble's sale in 1949 of the Kaylo business properties to Owens-Illinois was the last step in a series of several planned steps. *Distributors Finance Corporation*, 20 T.C. 768; *Charles R. Mathis, Jr.*, 19 T.C. 1123.

It is concluded that the 1949 transaction was not a part II transaction.

The television bulb profits were realized by Owens-Illinois during the period when it owned and operated the television bulb business. Section 433(b) provides that a corporation's excess profits net income for taxable years in the base period shall be "the normal-tax net income, as defined in section 13(a)(2)" adjusted as provided in paragraphs (1) through (18). Respondent does not contend that the television bulb profits realized by Owens-Illinois were not includible in its "normal-tax net income" for the years involved. In fact, he treated them as being the income of Owens-Illinois rather than of Kimble Glass for purpose of determining the income tax liability of Owens-Illinois and Kimble Glass for the years 1946–1949. Nor does respondent contend that any of the adjustments specified in paragraphs (1) through (18) of section 433(b) are applicable. Since the television bulb assets were not transferred to Kimble Glass in a part II transaction, we are unable to find a legal basis for respondent's action in excluding those profits from the average base period net income of Owens-Illinois.[3]

The situation is the same with respect to the Kaylo losses. Kimble Glass owned and operated the Kaylo business during 1948 and the first 6 months of 1949. The losses for those periods were realized by Kimble Glass. In determining the income tax liability of Owens-Illinois and of Kimble Glass for 1948 and 1949, the respondent did not attempt either to allow to Owens-Illinois or to disallow to Kimble Glass the losses realized by Kimble Glass for those years. Respondent does not contend that any of the adjustments prescribed in section 433(b) justify the allocation of the Kaylo losses of Kimble Glass to Owens-Illinois.

With respect to the 1946 and 1947 Kaylo losses realized by Owens-Illinois but allocated to Kimble Glass under section 462(i)(6), we understand that respondent's attempt to reallocate those losses is based on the same theory as his proposal to allocate to Owens-Illinois the 1948 and 1949 losses of Kimble Glass. It is our view that the 1946 and 1947 Kaylo losses were, however, properly allocated to Kimble Glass under section 462(i)(6), together with the glass block and insulator profits of Owens-Illinois for 1946 and 1947, and, therefore, that such Kaylo losses should be *excluded* from the average base period net income of Owens-Illinois.

We conclude that the base period transactions between Kimble Glass and Owens-Illinois were undertaken for sound business pur-

---

[3] Even if the television bulb assets had been transferred to Kimble Glass in a part II transaction, respondent's attempt to allocate to Kimble Glass the actual earnings experience of Owens-Illinois would not be proper because, under section 462(i)(6), such an allocation can only be made if an earnings experience agreement is executed between the parties to the part II transaction. There was, of course, no such agreement between Owens-Illinois and Kimble Glass, with respect to the 1949 transaction.

poses and were bona fide. Originally Kaylo was transferred to Kimble Glass, along with the glass block and insulator business, because it was thought that both operations were foreign to the basic glass container business of Owens-Illinois, that both products could be marketed in the building and construction industry, and that a strong company in that industry could be established. The evidence shows that it soon became apparent that considerable additional work had to be done in order to produce Kaylo profitably. It was decided that the Kaylo business should be transferred to Owens-Illinois to take advantage of its more experienced research personnel. In the meantime, it was decided that there should be a curtailment of efforts to market Kaylo. Technological problems in connection with the production of television bulbs led the management of Owens-Illinois to conclude that that operation should be transferred to Kimble Glass since Kimble Glass was producing glass blocks and insulators by the same glass pressing and sealing techniques which were required in the manufacture of television bulbs. Both moves turned out advantageously. Television bulbs were produced profitably by Kimble Glass, and Owens-Illinois ultimately was able to solve the problems involved in producing Kaylo which is now being produced at a profit. The business soundness of the 1949 transactions is evidenced today by the fact that Kimble Glass is still producing television bulbs, glass blocks, and insulators, and Owens-Illinois is still producing Kaylo. There is nothing in the record to support respondent's contention that the transactions were not bona fide. The fact that the television bulb properties and the Kaylo properties were sold at book value is not evidence of lack of bona fides or proof that the transaction was not an arm's-length transaction.

We hold that the respondent erred in *excluding* from the average base period net income of Owens-Illinois, the profits which it realized from the production of television bulbs; and that the respondent also erred in *including* in the average base period net income of Owens-Illinois, the Kaylo losses realized by, or allocated under part II to, Kimble Glass.

### *Liability for 1950 Excess Profits Tax.*

The issue is whether the liability for 1950 excess profits tax of each petitioner, imposed under section 430, was a liability to be taken into account at the beginning of 1951 in computing each petitioner's equity capital for the purpose of determining net capital addition for 1951 under section 435 (g).

Each petitioner contends that its excess profits tax liability for 1950 did not constitute a liability at the beginning of 1951 which is to be taken into account.

It is the respondent's position that each petitioner's excess profits tax liability for 1950 was a liability to be taken into account in computing its equity capital for 1951. He relies on the provisions of section 40.437.5(c) of Regulations 130 (explaining the definition of equity capital), as amended by T.D. 6065, which added subparagraph (2) to paragraph (c). See 1954–1 C.B. 164. The amendment, subparagraph (2), provides as follows:

(2) In computing liabilities as of the beginning of the taxable year, a taxpayer keeping its books and making its income tax returns on the accrual basis shall, in accordance with the principles applicable in the determination of earnings and profits, treat as a liability the Federal income and excess profits taxes imposed for the preceding taxable year. This rule is applicable whether or not such taxes were definite and ascertainable in amount at the close of the preceding year and whether or not such taxes were contested by the taxpayer. The provisions of the Excess Profits Tax Act of 1950 shall be taken into account for this purpose in determining the income and excess profits tax for taxable years ending after June 30, 1950. In general, changes in the Federal income and excess profits tax laws applicable to a taxable year, enacted after the close of such year, will be taken into account in determining liabilities if the last date prescribed for filing the return for such year is subsequent to the date of enactment of such changes.

The petitioners argue that the regulation is invalid, and that it is in conflict with a general rule that only absolute liabilities (not contingent ones) are to be taken into account in determining equity capital at any particular point of time. Sec. 40.437–5(c)(1), Regs. 130.

The petitioners argue that there was no absolute liability for excess profits at the beginning of 1951, and that such liability was only a contingent one because as of January 1, 1951, the Excess Profits Tax Act of 1950 had not been enacted and had not become law.

The petitioners also present an argument about the technical accounting rule which is to the effect that since "liabilities are debts" there can be no liability, or debt, for a tax which does not exist, absent the enactment of the law imposing the tax.

The term "equity capital" is defined in section 437(c) as follows:

The equity capital of the taxpayer as of any time shall be the total of its assets held at such time in good faith for the purposes of the business, reduced by the total of its liabilities at such time * * *

The contention of the petitioners is incorrect; the respondent's position is clearly the right one.

The Excess Profits Tax Act of 1950 was enacted by the Congress on January 2, 1951, and became law upon signature by the President on the morning of January 3, 1951, at 10:13 a.m. No Federal excess profits tax law had been in effect throughout the calendar year 1950, but the Excess Profits Tax Act of 1950 by express terms (sec. 430)

was made retroactively applicable with respect to taxable years ending after June 30, 1950.

In *American Enka Corporation*, 30 T.C. 684, 697, we considered the same general contention of a taxpayer. There the petitioner argued that section 40.437–5(c)(2), Regs. 130, was invalid and contrary to established law insofar as it required the accrual of a not-yet-enacted tax. There, as in these cases, the parties disagreed about the degree of certainty to be attached to the prospective passage of the 1950 Excess Profits Tax Act on the date of December 31, 1950.

We held in *American Enka* (p. 699) that section 40.437–5(c)(2) of Regulations 130 was a reasonable interpretation of section 437(c), insofar as it applied in that case, and pointed out that the taxpayer had more than a full year after the enactment of the law to make the required adjustments in its opening balance sheet for 1951 before filing its return for 1951. We rejected the taxpayer's contentions, which were substantially the same as those made here. Cf. *Commissioner* v. *Pacific Affiliate, Inc.*, 224 F. 2d 578, affirming 19 T.C. 245. We said (p. 699):

> While for income tax inclusion or deduction purposes petitioner's argument has merit * * *, nevertheless such a holding when applied to a taxpayer's equity capital computation leads to a patently inaccurate inclusion of financial worth. This is because the computation as at December 31, 1950, would reflect the total of petitioner's net earnings after income tax for that year, but would not reflect the excess profits tax subsequently imposed upon these earnings.

Each petitioner files its return on the basis of a calendar year and the returns for 1950 were due subsequent to January 3, 1951, when the 1950 Excess Profits Tax Act was signed by the President. The petitioners had sufficient time after the date when the law became effective to make the required adjustments in their opening balance sheet for 1951. The reasoning of *American Enka* applies here and we reach the same conclusion under the issue presented in these cases. It is concluded that each petitioner's liability for its 1950 excess profits tax was a liability to be taken into account in computing its equity capital for 1951 under section 437(c). Furthermore, we are unable to conclude that the applicable regulation (sec. 40.437–5(c)(2), Regs. 130) is either unreasonable, or invalid, or representative of clear abuse of discretion on the part of the Commissioner and Secretary of the Treasury. In the absence of proof of any of the above factors, we should be slow to hold that the regulation is invalid and should not overrule it "except for weighty reasons." On this general principle, see *Fawcus Machine Co.* v. *United States*, 282 U.S. 375. In principle, the respondent's view under this issue is supported by *United States* v. *Anderson*, 269 U.S. 422. See also *E. B. Crabtree Co.*,

5 B.T.A. 732; *Cruickshank Brothers Co.*, 11 B.T.A. 177; and *Nichols* v. *Sylvester Co.*, 16 F. 2d 98.

The liabilities of petitioners for their respective 1950 excess profits taxes existed at the beginning of 1951 and are to be taken into account in determining the net capital addition of each for 1951.

## Depletion of Feldspar.

During the year 1951 Owens-Illinois operated glassmaking plants at Oakland and Los Angeles, California. Two of the principal ingredients used in making glass are silica and feldspar. In the early 1940's Owens-Illinois, in order to obtain its own supply of the two necessary ingredients, entered into arrangements for the leasing of properties at Pacific Grove and Corona, California. These properties contained natural deposits of silica and feldspar. The leases gave Owens-Illinois the privilege of mining these natural deposits, and provided for rental payments computed by the number of tons mined.

The operations at both locations were relatively easy. At Pacific Grove the feldspar and silica were in the form of granulated sand located on the land surface in sand dunes. The sand was merely scooped up, washed, and screened to remove foreign matters, such as vegetation and then subjected to magnetic flotation to remove the iron content. The sand was then shipped to the Oakland plant, where it was used to make glass.

The operation at Corona, California, was only slightly more difficult. There, an overburden had to be removed before the dirt, consisting of approximately 40 percent clay and 60 percent silica and feldspar, was reached. This dirt, after mining, was washed to remove the clay particles; was crushed in rotating ball mills to reduce the deposit to the desired granular size; and, after draining and drying, was passed through magnetic separators to remove iron-bearing, heavy minerals. The resulting product, now in granulated form, was shipped to the Los Angeles plant where it was used in the manufacture of glass.

It must be observed that in both operations the feldspar and silica taken from the land were together in a mixture; they were never separated. In both instances the deposits, after the above-mentioned processing, were shipped to their respective glassmaking factories where they were used in the manufacture of glass without any additional silica or feldspar being added.

In its original income tax return for the year 1951, Owens-Illinois claimed a deduction for percentage depletion for the unseparated product as sand at 5 percent under the provisions of sections 23(m)

and 114(b) (4) of the 1939 Code.[4]   In determining the gross income from the property, Owens-Illinois used the value of $4 per ton for the amounts mined from the Pacific Grove property and $4.99 per ton for the amounts mined from the Corona property.   Owens-Illinois' computation resulted in a depletion deduction of $46,112.98.

Respondent determined that the sand in its unseparated condition was a commercially marketable product.   He further determined that the market price of the unseparated sand was $4 per ton with respect to the sand mined at Pacific Grove and $4.99 per ton for the dirt mined at Corona.   Since silica is depletable at 5 percent while feldspar is depletable at 15 percent, and since silica is not as valuable as feldspar, the respondent applied a weighted percentage in determining that portion of the adjusted gross income from the property which is depletable at the rate of 15 percent and that portion which is depletable at the rate of 5 percent.   The weighted percentage was determined by multiplying the relative values of separated feldspar and separated silica by the weight percentage of each mineral in the unseparated product.

The respondent's computation is as follows:

---

[4] SEC. 23.   DEDUCTIONS FROM GROSS INCOME.

(m) DEPLETION.—In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner, with the approval of the Secretary. * * *

For percentage depletion allowable under this subsection, see section 114(b), (3), and (4).

SEC. 114.   BASIS FOR DEPRECIATION AND DEPLETION.

(b) BASIS FOR DEPLETION.—

(1) GENERAL RULE.—The basis upon which depletion is to be allowed in respect of any property shall be the adjusted basis provided in section 113(b) for the purpose of determining the gain upon the sale or other disposition of such property, except as provided in paragraphs (2), (3), and (4) of this subsection.

*        *        *        *        *        *        *

(4) PERCENTAGE DEPLETION FOR COAL AND METAL MINES AND FOR CERTAIN OTHER MINES AND NATURAL MINERAL DEPOSITS.—

(A) In General.—The allowance for depletion under section 23(m) in the case of the following mines and other natural deposits shall be—

(i) in the case of sand, * * * 5 per centum,

*        *        *        *        *        *        *

(iii) in the case of * * * feldspar, * * * 15 per centum, * * *

*        *        *        *        *        *        *

of the gross income from the property during the taxable year, excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property.   Such allowance shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property, except that in no case shall the depletion allowance under section 23(m) be less than it would be if computed without reference to this paragraph.

(B) Definition of Gross Income from Property.—As used in this paragraph the term "gross income from the property" means the gross income from mining.   The term "mining" as used herein, shall be considered to include not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products, * * *

OWENS-ILLINOIS GLASS COMPANY—PACIFIC GROVE, CALIFORNIA, PROPERTY—1951

| | Total 100% | Feldspar 63% | Silica 47% |
|---|---|---|---|
| Tons produced and shipped | 134, 609 | 71, 343 | 63, 266 |
| Relative value times weight percentages | 100% | 63. 5% | 36. 5% |
| Gross income from property: | | | |
| Unseparated product at $4/ton | $538, 436. 00 | $341, 906. 86 | $196, 529. 14 |
| Byproduct sales | 6, 772. 20 | ----------- | 6, 772. 20 |
| Less royalties | 170, 163. 78 | 108, 054. 00 | 62, 109. 78 |
| Adjusted gross income | 375, 044. 42 | 233, 852. 86 | 141, 191. 56 |
| Direct costs | 173, 003. 87 | | |
| Adm. prorated | 28, 586. 31 | | |
| Net income | 173, 454. 24 | | |
| 50% of net income | 86, 727. 12 | | |
| 15% of gross income | ----------- | 35, 077. 93 | ----------- |
| 5% of gross income | ----------- | ----------- | 7, 059. 58 |
| Total percentage depletion | 42, 137. 51 | | |
| Allowable depletion | 42, 137. 51 | | |

OWENS-ILLINOIS GLASS COMPANY—CORONA, CALIFORNIA, PROPERTY—1951

| | Total 100% | Feldspar 23% | Silica 77% |
|---|---|---|---|
| Tons produced and shipped | 113, 981 | 26, 216 | 87, 765 |
| Relative value times weight percentages | 100% | 31. 6% | 68. 4% |
| Gross income from property: | | | |
| Unseparated product at $4.99/ton | $568, 765. 19 | $179, 729. 80 | $389, 035. 39 |
| Byproduct sales | 1, 345. 05 | ----------- | 1, 345. 05 |
| Less royalties | 22, 895. 89 | 7, 235. 10 | 15, 660. 79 |
| Adjusted gross income | 547, 214. 35 | 172, 494. 70 | 374, 719. 65 |
| Direct costs | 440, 229. 89 | | |
| Adm. prorated | 21, 850. 24 | | |
| Net income | 85, 134. 22 | | |
| 50% of net income | 42, 567. 11 | | |
| 15% of gross income | ----------- | 25, 874. 20 | ----------- |
| 5% of gross income | ----------- | ----------- | 18, 735. 98 |
| Total percentage depletion | 44, 610. 18 | | |
| Allowable depletion—Corona | 42, 567. 11 | | |
| Allowable depletion—Pacific Grove | 42, 137. 51 | | |
| Total depletion allowable on sand | 84, 704. 62 | | |
| Claimed on return— | | | |
| Corona  $27, 360. 76 | | | |
| Claimed on return— | | | |
| Pacific Grove  18, 752. 22 | 46, 112. 98 | | |
| Increased depletion deduction allowable on sand | 38, 591. 64 | | |

The respondent's determination resulted in an increased depletion deduction of $38,591.64 over the amount claimed by Owens-Illinois on its return.

Owens-Illinois now takes the position that although it was taking sand or dirt out of the ground it was, in effect, mining two minerals, namely, feldspar and silica. Therefore, in determining the income from the property for computing the depletion deduction, Owens-Illinois has valued the amount of unseparated feldspar taken from the land at $13 per ton, and has valued the silica, which it treats as sand, mined at Pacific Grove at $4 per ton and has valued the silica or sand mined at Corona at $4.99 per ton.

Owens-Illinois' computation is as follows:

CORONA, CALIFORNIA, PROPERTY

|  | Total 100% | Feldspar 23% | Silica 77% |
|---|---|---|---|
| Tons produced and shipped_____ | 113, 981 | 26, 216 | 87, 765 |
| Gross income from property: |  |  |  |
| Feldspar at $13_____ | $340, 808. 00 | $340, 808. 00 | _____ |
| Sand at $4.99_____ | 437, 947. 35 | _____ | $437, 947. 35 |
| Byproduct sales_____ | 1, 345. 05 | 309. 36 | 1, 035. 69 |
| Total_____ | 780, 100. 40 | 341, 117. 36 | 438, 983. 04 |
| Less royalties_____ | 22, 895. 89 | 5, 266. 05 | 17, 629. 84 |
| Gross income—adjusted_____ | 757, 204. 51 | 335, 851. 31 | 421, 353. 20 |
| Direct costs_____ | 442, 809. 13 |  |  |
| Subtotal_____ | 314, 395. 38 |  |  |
| Administration expense at 3.3%____ | 25, 743. 31 |  |  |
| 50% of net income_____ | 288, 652. 07 |  |  |
| 15% of adjusted gross income from feldspar_____ | _____ | 50, 377. 70 |  |
| 5% of adjusted gross income from sand_____ | _____ | _____ | 1, 067. 66 |
| Total percentage depletion_____ | 71, 445. 36 |  |  |
| Allowable depreciation_____ | 71, 445. 36 |  |  |

9 7

PACIFIC GROVE, CALIFORNIA, PROPERTY

| | Total 100% | Feldspar 53% | Silica 47% |
|---|---|---|---|
| Tons produced and shipped_ | 134, 609 | 71, 343 | 63, 266 |
| Gross income from property: | | | |
| Feldspar at $13_____ | $927, 459. 00 | $927, 459. 00 | |
| Sand at $4_____ | 253, 064. 00 | _____ | $253, 064. 00 |
| Byproduct sales_____ | 6, 772. 20 | 3, 589. 27 | 3, 182. 93 |
| Total_____ | 1, 187, 295. 20 | 931, 048. 27 | 256, 246. 93 |
| Less royalties_____ | 170, 163. 78 | 90, 186. 80 | 79, 976. 98 |
| Gross income—adjusted_____ | 1, 017, 131. 42 | 840, 861. 47 | 176, 269. 95 |
| Direct costs_____ | 172, 964. 81 | | |
| Subtotal_____ | 844, 166. 61 | | |
| Administration expense at 3.3%_____ | 39, 180. 74 | | |
| Net income_____ | 804, 985. 87 | | |
| 50% of net income_____ | 402, 492. 94 | | |
| 15% of adjusted gross income from feldspar_____ | _____ | 126, 129. 22 | |
| 5% of adjusted gross income from sand_____ | _____ | _____ | 8, 813. 50 |
| Total percentage depletion_ | 134, 942. 72 | | |
| Allowable depletion_____ | 134, 942. 72 | | |

This computation results in a claimed depletion deduction of $206,388.08 which is $121,683.46 more than the amount allowed by respondent.

Owens-Illinois argues that if it had not had its mining operations at Pacific Grove and Corona it would have had to, as it did for its other glassmaking plants around the country, purchase feldspar and silica in a separated form and mix the two ingredients together. In this event Owens-Illinois would have had to pay $13 per ton for the feldspar it purchased. Furthermore, Owens-Illinois observes that had it, in fact, separated the feldspar from the silica as it was mined from the ground, then the statute would have allowed them to compute income from the land upon the market value of the silica and feldspar in the separated form. Therefore, it is argued that in this case Owens-Illinois is entitled to have its income from the land computed as though this separation process were performed, thereby acquiring the higher value for the feldspar in computing the income, and yet not be required to make the separation because it would only

be a useless step, the two ingredients would have to be immediately mixed together again in order to manufacture the glass.

Respondent agrees that Owens-Illinois should be treated as though it were mining feldspar and silica, or sand, and that it is entitled, in the case of the feldspar, to the depletion rate applicable to it rather than the rate applicable to sand. However, respondent argues that in determining the income from the property the market value for the sand, composed of silica and feldspar mixed, must be used, and that for determining the depletion deduction, the income so computed is to be apportioned between the silica and feldspar so that the applicable depletion rate may be applied. To adopt Owens-Illinois' theory, respondent argues, is to allow a depletion deduction on a separation process which is unnecessary and not performed.

We agree with the respondent. Regulations 111, section 29.23(m)–1, provides, insofar as it is material here, as follows:

(f) "Gross income from the property," as used in section 114(b)(3) and (4) and sections 29.23(m)–1 to 29.23(m)–28, inclusive, means the amount for which the taxpayer sells the crude mineral product of the property in the immediate vicinity of the mine or well, but, if the product is transported or processed (other than by the processes excepted below) before sale, it means the representative market or field price (as of the date of sale) or crude mineral product of like kind and grade before such transportation or processing. If there is no such representative market or field price (as of the date of sale), then there shall be used in lieu thereof the representative market or field price of the first marketable product resulting from any process or processes (or, if the product in its crude state is merely transported, the price for which sold) minus the costs and proportionate profits attributable to the transportation and the processes not listed below. * * *

*       *       *       *       *       *       *

(h) "Crude mineral product," as used in paragraph (f) of this section, means the product in the form in which it emerges from the mine or well.

We understand this regulation to provide that in determining gross income from the property where the mined commodity is not sold in the immediate vicinity of the mine, and where the mined commodity is transported or processed (other than by certain excepted processes not applicable here), the representative market or field price of a mineral product of like kind and grade before such transportation or processing must be used. In the case of the mining operations at Pacific Grove and Corona the commodity being mined is a sand composed of silica and feldspar.

Owens-Illinois' evidence relating to the price of pure feldspar is not acceptable since feldspar is not a mineral product of a like kind and grade as the sand, composed of feldspar and silica, which results from the mining operations at Pacific Grove and Corona. Pure feldspar has been benefited by treatment processes beyond that actually applied to the Pacific Grove and Corona products.

We have found as a fact that the representative market price of the sand mixed and processed at Pacific Grove was $4 per ton and that the representative market price of the dirt mined and processed at Corona was $4.99 per ton. These are the values determined by respondent and there is nothing in the record to rebut them. It is upon these values that the income from the property should be computed, as the respondent has done.

In support of its position Owens-Illinois has cited Revenue Ruling 76, 1953–1 C.B. 176.

This revenue ruling says no more than that where a material, containing two or more minerals which have different percentage rates of depletion, is mined, then in determining the depletion deduction, the percentage rate applicable to each particular mineral is applied to the gross income from that mineral. When related to our problem it would mean that where sand, composed of silica and feldspar, is mined the depletion rates applicable to silica and feldspar are to be applied to the gross income from their respective minerals. This is not authority for the proposition, urged by Owens-Illinois, that in determining the income from the land a value for feldspar in a separated form may be imputed to the amounts of feldspar mined in a form mixed with silica, and which is never separated.

The respondent has done in this case what this revenue ruling states. He has determined properly the amount of income attributable to the feldspar and silica, and he has applied the applicable percentage rate of depletion to such amounts in determining the depletion deduction. His determinations of the amounts of allowable depletion deductions are sustained. The petitioner's claim for a larger depletion deduction is denied.

*Decisions will be entered under Rule 50.*